John HUDAK, Jr., and John M. Hudak, Defendants Below–Appellants,

v.

Anna PROCEK, Plaintiff Below–Appellee.

No. 416, 2000.

Supreme Court of Delaware.

Submitted: Aug. 28, 2001.
Decided: June 17, 2002.

---

David J. Ferry, Jr., Esquire (argued) and Rick S. Miller, Esquire, Ferry & Joseph, P.A., Wilmington, Delaware, for Appellants.

Laraine A. Ryan, Esquire, Hockessin, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, Justices, and HARTNETT, Justice (Retired) *, constituting the Court en banc.

VEASEY, Chief Justice (for the majority).

The issue before the Court on this appeal is whether or not the decision reached by the Court of Chancery after trial was based on findings of fact that are clearly erroneous or not the product of an orderly and logical deductive process. The trial judge found that the evidence rebutted the legal presumption that when parents provide funds for the purchase of property in the name of their daughter they intend a gift to the daughter. The trial judge also found that the complaint was not barred by laches.

The Court of Chancery imposed a resulting trust in favor of the surviving mother on a house purchased in 1978 with funds belonging to the mother and her late husband where title was placed in her late daughter's name. The effect of this decision is to defeat the claim to the house of the daughter's surviving husband and their son, who became the legal titleholders after the daughter's death.

This is the second appeal from a judgment of the Court of Chancery in this case. In the first appeal ("*Hudak I* "),[1] we reversed the trial court's judgment imposing a resulting trust on the house in the mother's favor on the ground that the Court of Chancery had applied the wrong legal presumption. In that decision, we held that, in these circumstances, a gift to the daughter from her parents must be presumed, although the presumption is rebuttable. In *Hudak I* we also upheld the determination of the Court of Chancery that the mother's claim was not barred by laches. We remanded the matter to the Court of Chancery for further consideration, applying the correct legal presumption and the proper burden of proof necessary to rebut the presumption.

On remand, the Court of Chancery, applying the correct legal presumption, concluded on the basis of evidence adduced at trial that the mother had rebutted the presumption. The trial judge found that the mother and her late husband had not intended in 1978 to make a present, unconditional gift of the disputed property to their late daughter when they provided the money to the daughter to purchase the house.

On this appeal, our scope of review is narrow and accords considerable deference to the trial judge's factual findings unless they are clearly erroneous or not the product of an orderly and logical deductive process.[2] We conclude that the Court of Chancery applied the correct legal standards in this case. We have reviewed the entire record and have tested the trial judge's factual findings in accordance with the appropriate standard of review.

Based upon our review of the record, and with the required exercise of judicial restraint, we conclude that the factual findings of the Court of Chancery are rationally supported by clear and convincing evidence and are the product of an orderly

---

* Sitting by designation pursuant to DEL. CONST. art. IV, § 38 and 29 Del. C. § 5610.

1. *Hudak v. Procek,* 727 A.2d 841 (Del.1999).

2. *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del. 1972).

and logical deductive process. Viewing those factual findings as a whole, we find that they are entitled to deference whether or not we would independently have reached the same conclusions.

Thus, the conclusion of the Court of Chancery that the mother rebutted the legal presumption of a gift to her daughter was not clearly erroneous and was the product of an orderly and logical deductive process. We also find no error in the trial court's conclusion that the mother's claim was not barred by the doctrine of laches. Finally, the remedy of a resulting trust imposed by the trial court was not an abuse of discretion. Accordingly, we affirm the judgment of the Court of Chancery and remand for proceedings consistent with this Opinion.

### Facts

Anna Procek and her husband John immigrated to New Jersey from Czechoslovakia. Although the Proceks lived in the United States for many years, they never became fully immersed in the American way of life. The Proceks did not drive, and they used cash to pay all of their debts and make necessary purchases. They lived in an ethnic neighborhood in New Jersey near family and close friends where they could retain their Czech culture.

In 1978, the Proceks were in their mid-seventies. Although in good health, the Proceks sold their home in New Jersey and moved to Delaware to be near their eldest daughter, Helen Hudak, who encouraged them to move closer to her and promised to take care of them in their advancing years.

Because the Proceks were not native English speakers and were not experienced in handling real estate transactions, they gave Helen the cash proceeds from the sale of their New Jersey house and asked Helen to buy a house for them in Delaware. Helen did so and used a substantial portion of the Proceks' funds to purchase a house for the Proceks one block from her home. To carry out the purchase, Helen hired a lawyer, deceased at the time of trial, to conduct the real estate settlement. The Proceks were not present at the settlement transaction. Title of the house was put solely in Helen's name, although she was married to John Hudak, Jr., and had been married to him since 1955.

The Proceks immediately moved into the property and lived there continuously and exclusively. The Hudaks lived nearby. For years the Proceks paid all of the expenses associated with the property, such as the utilities, sewer, taxes, insurance, and upkeep. Helen took them to stores and to medical appointments, and she assisted with their finances. The Proceks gave cash to Helen who wrote checks to pay the Proceks' bills. Helen's husband, John, also would assist the Proceks on occasion with house repairs and transportation to appointments.

After a short illness, Helen died prematurely and unexpectedly of cancer in April 1990. Upon Helen's death, title to the Proceks' house passed from Helen's estate to her husband, John. Earlier in 1990, shortly before she died, Helen had offered to transfer legal title to the Proceks, but they declined.

At some point thereafter, the Proceks evidently became concerned that Hudak might remarry, and the Proceks might be forced out of their house. John Procek, plaintiff's late husband, and Hudak signed an agreement, dated June 1, 1990, providing that the Proceks could live in the house for the rest of their lives. Anna Procek did not sign this agreement, and the record does not reveal that she acquiesced in the agreement. John Procek died in 1993. Anna continued to live in the house until

1996 when, due to her advanced age, she moved out of the house and moved in with another daughter, Irene Setz.

Shortly thereafter, Anna's surviving daughters, Irene and Annie, both asked Hudak to sell the house and to divide the proceeds equally among the three of them. Hudak refused. He moved into the disputed property,[3] and in October 1996, he transferred title to himself and his son jointly.[4] His daughter, Marilyn, moved into his former residence. Anna Procek then filed her complaint requesting the Court of Chancery to impose a resulting trust on the property in her favor.

At the time of trial in 1998, the plaintiff, Anna Procek, was 94 years old. Procek and Hudak both testified at trial. Also testifying for Procek was her daughter, Irene Setz, Helen's sister. Testifying on behalf of Hudak was his daughter, Marilyn Brill.[5] The Court of Chancery, after trial on the merits, found that Anna Procek, and not John Hudak, is the rightful owner of the property.

On appeal, this Court reversed the judgment of the Court of Chancery on the ground that the trial court applied the wrong presumption. After further consideration on remand, the trial judge, applying the correct legal presumption, concluded that the evidence rebutted the legal presumption of an unconditional gift from the Proceks to Helen Hudak when the property was placed in Helen's name in 1978. The Court of Chancery ordered a resulting trust in favor of plaintiff Anna Procek. The defendants again appeal.

### Resulting Trust: Presumption of a Gift

A resulting trust is an equitable remedy by which a court of equity may give effect to the intentions of the parties to a transaction.[6] As a general rule, equity will presume, absent contrary evidence, that the person supplying the purchase money for property intends to retain a beneficial interest in the property and that title is placed in the name of another for some incidental reason.[7] The court therefore may impose a resulting trust requiring the person with legal title to hold that title for the benefit of the person supplying the purchase money. A resulting trust thus is not a trust at all. It is an equitable remedy designed to prevent unjust enrichment and to ensure that legal formalities do not frustrate the original intent of the transacting parties.[8]

In *Hudak I*, we held that when the person supplying the purchase money is a parent who places legal title to property in the name of a child, the opposite legal presumption arises. That presumption, which is rebuttable, is that the parent intended to make a gift of the property to

---

3. Since moving into the property in 1996, Hudak apparently has paid the expenses associated with maintaining the property.

4. A week before Anna Procek filed her complaint in the Court of Chancery, John Hudak, Jr. transferred title of the disputed property to himself and his son, John M. Hudak, for no consideration. Procek did not name John M. Hudak as a defendant in her complaint, nor was he named as a party in the first appeal. He was added as a necessary party when this Court remanded the case following the first appeal.

5. Hudak also presented other testimony through the admission into evidence of deposition transcripts.

6. *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del.1982) ("A resulting trust arises from the presumed intentions of the parties and upon the circumstances surrounding the particular transaction.").

7. *Id.*

8. *See id.* at 152 n. 4 (citing 1 POMEROY's EQUITY JURISPRUDENCE § 166, at 210–11 (5th ed.1941)).

the child and did not intend to retain an ownership interest in the property.[9] This presumption is founded on the premise that people generally intend to transfer legal title to close family members only when they wish to make a gift.[10] The person against whom the presumption operates, i.e. the donor parent, must produce clear and convincing evidence to rebut the presumption of a gift.

### Rebutting the Legal Presumption of a Gift Burden of Proof

■ In order to rebut a legal presumption, courts uniformly have applied an intermediate standard of proof that is more strict than the "preponderance of the evidence" standard but not as strict as the "beyond a reasonable doubt" standard that pertains in the criminal law.[11] Delaware

courts, in many different contexts, have expressed the burden of proof that the adversely affected party must satisfy in order to rebut a legal presumption to be "clear and convincing evidence."[12] The clear and convincing standard requires evidence that "produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] 'highly probable.'"[13] Similarly, the pattern civil jury instruction used by the Delaware Superior Court provides, in part, "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt."[14] We believe that this pattern jury instruction is a proper articulation of the standard.

■ Although neither this Court in *Hudak I* nor the Court of Chancery on re-

9. *Hudak v. Procek*, 727 A.2d 841, 843 (Del. 1999) *(citing McCafferty v. Flinn*, 125 A. 675, 677 (Del.Ch.1924); Restatement Second Of Trusts § 442, cmt. b).

10. See Restatement (Second) Of Trusts § 442.

11. 29 Am. Jur.2d *Evidence* § 157 (1994) (collecting cases). *See also* Charles C. Marvel, Annotation, *Unexplained Gratuitous Transfer of Property from One Relative to Another as Raising Presumption of Gift*, 94 A.L.R.3d 608, 611 (1979); 2 John W. Strong, Mccormick On Evidence § 340 (5th ed.2001) (phrases to describe the intermediate evidentiary burden include: "by clear and convincing evidence," "clear, convincing, and satisfactory," "clear, cogent and convincing," and "clear, unequivocal, satisfactory and convincing."); Black's Law Dictionary 577 (7th ed.1999); *In re Tavel*, 661 A.2d 1061, 1070 n. 5 (Del.1995).

12. *See, e.g. In re Melson*, 711 A.2d 783 (Del. 1998) (presumption of testamentary capacity may be rebutted by clear and convincing evidence); *Somerville v. State*, 703 A.2d 629 (Del. 1997) (presumption of truthfulness of guilty plea may be rebutted by clear and convincing evidence); *Blake v. Division of Child Support Enforcement*, 525 A.2d 154 (Del.1987) (presumption of paternity may be rebutted by clear and convincing evidence); *Robert O. v.*

*Ecmel A.*, 460 A.2d 1321 (Del.1983) (presumption of undue influence may be rebutted by clear and convincing evidence); *Justice v. Gatchell*, 325 A.2d 97 (Del.1974) (presumption of constitutionality of legislation may be rebutted by clear and convincing evidence); *Melson v. Allman*, 244 A.2d 85 (Del.1968) (presumption of agency may be rebutted by clear and convincing evidence).

13. *Cerberus Int'l v. Apollo Mgmt.*, 794 A.2d 1141 (Del.2002) (quoting In re Rowe, 566 A.2d 1001, 1003 (Del.Jud.1989)). *See also Shipman v. Division of Social Services*, 454 A.2d 767, 769 (Del.Fam.Ct.1982) (holding that clear and convincing means the degree of proof that will produce in the mind of the fact-finder "a firm belief or conviction as to allegations sought to be established"), *aff'd, Betty J.B. v. Division of Social Services*, 460 A.2d 528 (Del.1983). *Accord* 29 Am. Jur.2d *Evidence* § 157 (1994) (collecting cases); 2 John W. Strong, Mccormick On Evidence § 340 (5th ed. 2001) ("It has been persuasively suggested that [the clear and convincing standard] could be more simply and intelligibly translated to the jury if they were instructed that they must be persuaded that the truth of the contention is 'highly probable.'").

14. Del. Pattern Jury Instructions Civil § 4.3 (2000).

mand explicitly referred to the term, we hold that Procek was required to rebut the presumption of a gift by "clear and convincing evidence." Accordingly, Procek was required to present sufficient evidence to persuade the Court of Chancery that it was highly probable that she and her husband did not intend in 1978 to make an unconditional inter vivos gift of the property to Helen.

To prove intent in the absence of any contemporaneous documentation, a party generally may offer two types of evidence. First, the parties themselves may testify about (or provide other extrinsic evidence of) their intent *at the time of the transaction.* Second, the parties' conduct *after* the transaction, in some cases, may shed light on the parties' contemporaneous understanding of the original agreement.[15]

### Trial Court's Findings of the Intentions of the Proceks in 1978

In reaching the conclusion that Anna Procek had rebutted the presumption of a gift, the trial court relied primarily on the undisputed circumstances surrounding the 1978 transaction and on her testimony at the 1998 trial concerning the intent of the parties in 1978. The trial court found the following undisputed facts to be significant.

The Proceks were in their mid-seventies at the time of the transaction. They did not speak English as their first language. They were not experienced with the American legal system. They relied on Helen to secure the purchase of a home for them in Delaware. They gave Helen cash from the sale of their New Jersey home to pay the entire amount of the purchase price of the property. The money given to Helen represented most of the Proceks' assets. There was no record of a gift tax filing.

At the time of the acquisition of the property, Helen hired the real estate lawyer (now deceased) who handled the settlement and was paid by the Proceks' funds. The lawyer did not meet with the Proceks and thus never discussed with the them the consequences of, or any alternatives to, deeding the property to Helen outright. The Proceks did not attend the settlement. After settlement, they immediately moved into the property and treated it as their home. The Proceks lived in the property continuously and exclusively until 1996, paying all of the expenses associated with the property, including taxes, utilities, sewer, insurance, upkeep, and maintenance. Helen never lived in the house.

The Court of Chancery found Anna Procek's testimony to be highly credible, notwithstanding her advanced age and thick accent. At the trial, when she was asked whether she intended to give Helen the house in 1978, Anna responded: "I don't know. See, I pay every penny for my house. She not pay nothing, just take care of me, you know." Similarly, Anna testified that she thought the house belonged to her because "I pay every penny for this house." When asked why the Proceks put their house in Helen's name, Anna responded: "I think she needs to take care of me but she die so quick." When asked whether she wanted Helen to have the house after the Proceks died, Anna testified that "she could take care of me. I could give, you know, but I still living. And she died so quick." Obviously Anna Procek had not considered it likely that Helen would predecease her.

---

15. *Cf. Greenly v. Greenly,* 49 A.2d 126, 130 (Del.1946) ("The rights of the parties must be determined as of the time of the execution and delivery of the deed, and subsequent acts, unless so closely connected therewith as to throw some light on that transaction, are ordinarily of little importance.").

From this live testimony, the trial judge found as a fact that the Proceks did not intend in 1978 to make a present unconditional gift of the property to Helen. Instead, the trial court found that the circumstances of the 1978 transaction, together with Anna's testimony, reflected an intent that, upon their deaths (which the Proceks assumed would be before Helen's), the Proceks wanted to be able to reward Helen by giving her the house for the care they anticipated she was going to provide to them in their last years. The trial court found that title to the house had been placed in Helen's name in 1978, not as an expression of an outright gift, but to facilitate the initial purchase of the house with the proceeds of the sale of the Proceks' New Jersey home, to facilitate Helen assisting the Proceks by paying bills related to the house, and to facilitate transfer of ownership of the house to Helen upon the Proceks' deaths.

The Court concluded, based on the trial testimony, as well as the circumstances that existed in 1978, that Anna had rebutted the presumption of a gift by producing sufficient evidence that the "Proceks intended that beneficial as well as legal title to the house would pass to Helen after, and only after, she survived both her parents." [16] Although the Court of Chancery considered evidence of the parties' conduct after the 1978 transaction, the Court did not find this later conduct to be persuasive or even particularly useful evidence of the parties' intent in 1978.[17]

Furthermore, the Court of Chancery concluded after remand, for the second time, that Procek's claim was not barred by laches. The Court held that Anna Procek's delay in bringing suit was not unreasonable under the circumstances because she had no reason to know that Hudak claimed a fee simple interest in the property until 1996. The Court also found that Hudak was not prejudiced by any delay.

### Hudaks' Contentions on Appeal

The Hudaks raise two issues in this appeal. First, they contend that the record does not support the factual findings of the Court of Chancery and the inferences drawn from the evidence at trial. Therefore, they argue that the Court of Chancery erred in concluding that the legal presumption of a gift had been rebutted by clear and convincing evidence. Second, the Hudaks assert that the Court of Chancery was clearly wrong in determining that Procek's claim was not barred by the doctrine of laches.

### Standard of Review on Appeal

 On appeal from a trial court's ruling based on the clear and convincing standard of proof relating to the rebuttal of a legal presumption, this Court will review the entire record and test the propriety of the trial judge's factual findings to "assure that they are sufficiently supported by the record and result from an orderly and logical deductive process." [18] If the discretionary findings are sufficiently supported by the record and are the product of an orderly and logical deductive process, this Court in the exercise of judicial restraint, will not disturb those findings, even though independently we might have reached opposite conclusions. This Court is free to make independent findings of fact only if the findings of the trial court are clearly wrong and justice requires their overturn.[19]

---

16. *Procek v. Hudak,* 2000 WL 546079 at *5, 2000 Del. Ch. LEXIS 62, *19.

17. *Id.* at *5, 2000 Del. Ch. LEXIS 62, *19–22.

18. *In re Stevens,* 652 A.2d 18, 23 (Del.1995).

19. *Id.*

▮ Specifically applying this time-honored principle to this case, in which the quantum of proof required to overcome the presumption is measured by the "clear and convincing" standard, we are free to overturn the fact-finder *only* if we conclude that no *rational* trier of fact could find that the clear and convincing threshold had been met.[20] We have not·so concluded.

▮ Regardless of the applicable standard of proof at trial, this Court regularly defers to the unique opportunity of the fact-finder, whether judge or jury, to evaluate the live witnesses, to evaluate their demeanor and credibility and to resolve conflicts in the testimony.[21] Accordingly, this Court on appeal will test individual findings of fact only to ensure that the factual findings and inferences are supported by "competent evidence."[22] The weight to be given to evidence, however, is for the trier of fact to determine.[23] The legal rulings of the trial court, of course, are subject to *de novo* review in this Court.

### *Presumption of Gift Rebutted*

▮ The purpose of a presumption in the context of a case like this is to provide a logical result when the intent of the parties at the time of the transaction is not documented by contemporaneous writing. If, however, there is other sufficient evidence of the parties' intent—from the parties themselves or from the circumstances of the transaction—the presumption may be rebutted. Although the presumption of a gift arises under the circumstances of this case, we must acknowledge that the

facts of this case are unusual. The trial judge rationally found from the parties' conduct at the time of the transaction and immediately thereafter that the Proceks intended to purchase a home for themselves. Accordingly, he rationally concluded that the Proceks did not intend to finance their daughter's purchase of a home for herself.

Although titling of the property in Helen's name creates the presumption of a gift, it is significant that the Proceks themselves, due to their advanced age and inexperience, did not purchase the property themselves and did not oversee titling of the property. They were not present at the settlement and had no communication with the real estate lawyer who handled the transaction. The Proceks were elderly immigrants who did not live under the American legal system. They did not receive the advice of a lawyer before consummating the purchase, but instead relied solely on the advice of their daughter. While they may have authorized Helen's action in placing title to the property in her name, they did not themselves undertake the action of placing title in Helen's name. As the Court of Chancery found, it is likely the Proceks did not consider or understand the legal significance of Helen's titling the property in her own name.

▮ Moreover, the actions of the Proceks regarding the property, in 1978 and thereafter, simply were not consistent with the giving of an unconditional gift. As a general rule a gift must be executed (a) by the donor's complete and unconditional delivery of the property that is the subject of the gift and (b) by the donee's

---

20. Cf. *Cerberus Int'l v. Apollo Mgmt.*, 794 A.2d 1141 (Del.2002) (holding that summary judgment is improper if any rational fact-finder could find clear and convincing evidence to support the nonmoving party).

21. *Id.; Schock v. Nash*, 732 A.2d 217, 224 (Del.1999); *Stegemeier v. Magness*, 728 A.2d

557, 561 (Del.1999). *See also Tyre v. State*, 412 A.2d 326, 330 (Del.1980).

22. *Blake v. DCSE*, 525 A.2d at 158.

23. *Wagner v. Ware*, 547 A.2d 634, 1988 WL 93483 (Aug. 3, 1988) (Del.Supr.).

acceptance of the gift.[24] Although it is possible for a donor to make a present gift of real property but retain a life estate in the property, it still must be the donor's intention at the time of the alleged gift to vest the donee with *immediate and irrevocable* dominion and control over the property.[25] If the donor does not transfer dominion and control over the property at the time of the alleged gift and anything remains to be done to accomplish the gift, the transaction constitutes merely an executory agreement to give, and the title to the property does not pass.[26]

The trial judge rationally concluded that the actions of the Proceks in 1978 were not, contrary to Hudak's contentions, consistent with an intent to vest Helen with immediate and irrevocable dominion and control over the property. The Proceks paid the entire purchase price of the property. They immediately moved into the property and lived there continuously and exclusively. They paid all of the expenses associated with ownership of the property.[27] Helen contributed nothing in that regard.

Accordingly, we find that the circumstances of the 1978 transaction, standing alone, provided clear and convincing evidence sufficient to rebut the presumption of a gift. Furthermore, although Anna Procek's testimony was obscured by her age and the language barrier, it was competent, and it was sufficient to support the trial judge's finding that the Proceks did not intend in 1978 to give to Helen, completely and unconditionally, their only substantial asset.[28] Based on Anna Procek's testimony, the court concluded that the Proceks expected Helen would assist them in their twilight years, and in exchange for that assistance the Proceks intended to reward Helen, upon their death, with ownership of the house. The conclusion of the Court of Chancery that "the Proceks intended that beneficial as well as legal title to the house would pass to Helen after, and only after, she survived both her parents" is supported by the record and is the product of a logical and orderly deductive process.

### The Trial Court's Findings Concerning Post–1978 Events

We find no merit to the Hudaks' contention that the parties' conduct after the

24. *Wilmington Trust Co. v. General Motors Corp.*, 51 A.2d 584, 593 (Del.1947).

25. 38 Am. Jur. 2D § 20 (1999) (collecting cases).

26. *Id.*

27. Hudak contends that the Court of Chancery ignored evidence that the Proceks' maintained renters' insurance on the property rather than homeowners' insurance, and this "fact" implies that the Proceks' understood they did not own the property. The record reflects that the Court of Chancery did not ignore this testimony but simply rejected it as unsubstantiated. As the sole trier of fact, the Court of Chancery was responsible for determining witness credibility, resolving conflicts in the testimony, and weighing the evidence presented. *See Tyre v. State*, 412 A.2d 326, 330 (Del.1980). The trial court could properly reject Hudak's testimony on this point as unsubstantiated, given the lack of written documentation.

28. Hudak appears to argue that Anna's testimony was not reliable because she could not remember facts like her second daughter's last name and her present address. These arguments ignore the Vice Chancellor's position as the sole judge of the credibility of live witness testimony. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.1972) ("When the determination of facts turns on a question of credibility and the acceptance or rejection of 'live' testimony by the trial judge, his findings will be approved upon review."). To the extent that memory lapses affect the witness' credibility, this Court must rely on the trial court to take such facts into consideration in weighing the evidence.

1978 transaction is persuasive evidence of the Proceks' intent *to make a fee simple gift* to Helen in 1978. Hudak focuses on two events that took place after the transaction to support his argument that the Proceks gave the house to Helen as an unconditional gift in 1978.

First, shortly before her death in 1990, Helen, who was ill at the time, asked the Proceks if she should retitle the property in their names, but the Proceks declined her offer.[29] On the one hand, a fact-finder could rationally infer that this conduct by Helen indicates that she thought that the Proceks were the beneficial owners of the property. Otherwise, it would make no sense for her to turn the deed over to them before her death. On the other hand, because the Proceks refused this offer, a fact-finder could rationally infer that the Proceks—as of 1990, twelve years after the purchase—wanted Helen to retain title.

The trial judge opted for the inference that the Proceks declined the offer because they *did not want to admit to themselves* that Helen was near death and because they did not want to create a rift in the family.[30] This inference was supportable as a refutation of the potential inference that the refusal tended to show that Helen was the beneficial owner. After reviewing the entire record, we conclude that, at best, these actions (which occurred more than a decade after the original transaction) are ambiguous and do not provide useful evidence of the Proceks' intent in 1978. First, these events took place under extreme circumstances (during Helen's sudden illness and eventual death) twelve years after the original transaction. Second, the parties' later conduct indicated, at best, some confusion regarding the intended effect of the original transaction. In our view, the ambiguity arising from this 1990 event is insufficient to render clearly erroneous the trial judge's finding of the Proceks' 1978 intent.

As this Court suggested in its first opinion, the second post-transaction incident presents a more serious challenge to Anna's argument.[31] After Helen's death, John Procek evidently was concerned that Hudak could evict the Proceks from the home. John Procek then requested "permission" to live in the house until their deaths.[32] Hudak argues that a memoran-

---

29. Hudak contends that Helen offered to transfer the property to her parents on several occasions. The only record support for this proposition cited by Hudak is his own limited trial testimony on this point. Hudak testified that Helen offered "to give the house back" whenever she became "stressed out from the activities of taking care of [her parents]." Hudak did not testify about any specific offers made by Helen or the Proceks' response to them. The Court of Chancery's opinion does not include as a finding that Helen offered to retitle the property on more than one occasion. As the sole trier of fact, the Court of Chancery could properly reject Hudak's vague and unsubstantiated testimony on this point. *See Tyre v. State,* 412 A.2d at 330.

30. Hudak also refers to testimony by the Procek's neighbors, the Tobins. This testimony, however, was equivocal as to the legal status of the Proceks' home. While Helen was alive,

the Proceks referred to the house as "Helen's house." This statement is consistent with a fee simple gift *and* with a gift subject to a survivorship condition where the Proceks assumed that Helen would survive them. The ambiguity of this statement is underscored by Mr. Tobin's testimony that, after Helen's death, the Proceks referred to the house as "Marilyn's house" (the Procek's granddaughter and Hudak's daughter) and as "John [Hudak]'s house."

31. *See Hudak,* 727 A.2d at 843 ("The Court of Chancery should also address why the agreement between John and the Proceks did not defeat Anna's claim.").

32. The agreement provided: "It is understood and agreed that Mr. John Hudak Jr. grants permission to Mr. John Procek and Mrs. Anna Procek, his father and mother-in-law, to re-

dum, signed by John Procek (but not Anna Procek) and Hudak in 1990, defeats Procek's claim because it constitutes: (1) evidence of the Proceks' intent to give Helen a gift of a fee simple or a vested remainder (while retaining a life estate for themselves); (2) acquiescence in Hudak's legal title; (3) a novation to the original agreement (substituting Hudak for Helen as promisor); or (4) a waiver of the survivorship condition.

The Court of Chancery considered the 1990 memorandum and found that it was not persuasive or even particularly useful evidence of the parties' intent in 1978. The court found that the 1990 memorandum containing John Procek's request for "permission" for the Proceks to live in the house was reflective of a desire to avoid confrontation and find the simplest means for the Proceks to avoid being thrown out of their own home. The Court found the memorandum to be the product of the panicked reaction of persons unfamiliar with their legal rights when faced with the possibility of eviction. In short, the Court of Chancery concluded that the memorandum was evidence of the Proceks' concerns in 1990 but did not reflect their intent in 1978. We find that the record supports that conclusion, whether or not we would have independently reached the same conclusion.

Moreover, we believe the conclusion of the Court of Chancery that the Proceks' behavior in 1990 comports with human behavior is logical and rational. Parents with three living daughters are not likely to give *all* of their assets to one of their children, even in exchange for the child's

assistance—unless the transfer includes a condition that the child survives the parents. The circumstances of the transaction and the testimony at trial, together with the trial court's intuitive inference, is sufficient to support the trial court's conclusion that the 1978 transaction was not intended as an outright gift, but as a gift conditioned on Helen's care for her parents and her survival of them.

In light of the broad discretion accorded to a trial judge sitting as trier of fact in evaluating testimony, weighing credibility, and drawing appropriate inferences, we hold that the Court of Chancery's factual findings are not "clearly wrong" and that justice does not require their overturn.[33] Moreover, we find no legal error in the trial court's conclusion that the 1990 memorandum signed by John Procek and Hudak did not defeat Anna's claim.

### Laches Law of the Case

 The doctrine of laches acts as a bar to an action in equity if the defendant carries the burden of persuasion that two conditions have been satisfied: (1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant.[34] What constitutes unreasonable delay and prejudice are questions of fact that depend upon the totality of the circumstances.[35]

In its first opinion, following trial, the Court of Chancery concluded that neither of the conditions was satisfied with respect to Anna's suit. On appeal, this Court concluded that "[f]rom the record, we find no error in the trial court's determination that

side in the above mentioned residence until they both decease."

**33.** *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del. 1972).

**34.** *See Hudak,* 727 A.2d at 843; *Fike v. Ruger,* Del.Supr., 752 A.2d 112, 113 (Del.2000).

**35.** 727 A.2d at 843 *(quoting Federal United Corp. v. Havender,* 11 A.2d 331, 343 (Del. 1940)).

Procek's claim is not barred by laches."[36] Nonetheless, we did not preclude the Court of Chancery from revisiting the laches issue on remand, if it wished.[37]

On remand, the Court of Chancery accepted further legal argument from the parties but did not conduct any further hearings or render any additional or different findings of fact. After applying the correct legal presumption and concluding that there was sufficient evidence to rebut the presumption of a gift, the Court of Chancery reevaluated Hudak's laches defense and again concluded that Anna's claim was not barred by laches. Specifically, the trial court reiterated the conclusions reached in its first, post-trial opinion that: (1) any delay in Anna's decision to file suit against Hudak was not unreasonable under the circumstances because she did not have adequate information concerning the legal status of the property; and (2) Hudak could not establish that he was unfairly prejudiced by delay. It is important to observe that, while Procek had the burden of overcoming the presumption of a gift by clear and convincing evidence, the burden to prove the elements of laches—both delay and prejudice to defendants—rests upon the defendants.[38]

■ Although our opinion in *Hudak I* did not bar reconsideration by the Court of Chancery of the laches issue "as part of its consideration of all of the evidence on remand,"[39] it is significant that the trial court's decision on remand did not contain any new or different findings of fact. When facts have remained constant throughout the subsequent course of the same litigation, the trial court's previous rulings applying legal principles to a constant set of facts generally establish the "law of the case."[40]

■ The law of the case doctrine is founded on principles of stability and respect for court processes and precedent.[41] Although the doctrine is not inflexible, this Court has held that a prior legal ruling based on a constant set of facts should be reconsidered only if it is "clearly wrong, produces an injustice or should be revisited because of changed circumstances."[42] We do not find those exceptions to be applicable here.

Our decision in *Hudak I* is sound law and is not clearly wrong. Although this Court in a more recent decision than *Hudak I* found the plaintiffs' claims to be barred by laches, the facts of that case are distinguishable from the present case. In *Fike v. Ruger*,[43] we found that the plaintiffs had notice and/or actual knowledge of their claims since the mid-to late–

**36.** *Hudak*, 727 A.2d at 843.

**37.** *Id.* ("The Court of Chancery may revisit its ruling [on laches], if it wishes, as part of its consideration of all of the evidence on remand.").

**38.** *See* Chancery Rule 8(c) requiring that laches and other affirmative defenses be set forth affirmatively by the pleader asserting any such defense. *See also Bash v. Board of Medical Practice*, 579 A.2d 1145, 1153 (Del.Super.Ct.1989), cited with approval in *Kotler v. Board of Medical Practice*, No. 82, 1993, 630 A.2d 1102, 1993 WL 307621 Veasey, C.J. (July 29, 1993) (party asserting laches has burden to establish affirmative defense); *cf. National*

*Fire Insurance Co. v. Eastern Shore Labs., Inc.*, 301 A.2d 526 (party asserting the affirmative defense of estoppel has burden to establish).

**39.** *Hudak v. Procek*, 727 A.2d at 843.

**40.** *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990).

**41.** *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1181–82 (Del.2000).

**42.** *Brittingham v. State*, 705 A.2d 577, 579 (Del.1998).

**43.** 752 A.2d 112 (Del.2000).

1980s. In affirming the dismissal we concluded that the plaintiffs' delay in filing suit until 1998 was unreasonable under the circumstances of that case and unfairly prejudiced the defendants because two key witnesses had died and because the defendants could have avoided significant personal losses if the plaintiffs had filed suit earlier.[44]

■ Our decision in *Fike* does not control the outcome here, nor is it a reason to reconsider the soundness of our laches decision in *Hudak I*. The laches analysis necessarily depends upon the totality of the circumstances of each individual case. There is no rigid rule that can be applied to every case.[45] In this case, the Court of Chancery held that Anna Procek, as a matter of fact and law, was not on notice of Hudak's claim to a fee simple interest in the property until 1996, when Hudak was requested to sell the property and refused.

■ Moreover, the conclusion of the Court of Chancery that Hudak was not unfairly prejudiced by the death of two witnesses to the original 1978 transaction is supported by the evidence. Because Hudak had no independent legal interest in the property until his wife's death in 1990, when title to the property passed to him through the residuary clause of her will,[46] Hudak cannot claim prejudice as a result of his wife's death when, in fact, his interest in the property would not exist but for his wife's death. Furthermore, although John Procek's testimony concerning the 1990 memorandum could have been helpful to the Court of Chancery in understanding the parties' intent in 1990, we already have affirmed the trial judge's factual finding that the 1990 memorandum was not determinative of the parties' intent in 1978. Thus, given the live testimony of Anna Procek concerning the parties' intent in 1978, we will not disturb the trial court's conclusion that the defendants have not established that John Procek's death unfairly prejudiced Hudak.

Accordingly, we find no error in the conclusion of the Court of Chancery that the defendants did not sustain their burden of proving the elements of laches.

44. *Id.* at 114.

45. *See Adams v. Jankouskas*, 452 A.2d 148 (Del.1982). In that case we held:

Knowledge and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of a s wrongful and bringing of suit to prevent or correct the wrong does not, in itself, determine the questions of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances. *No rigid rule has ever been laid down.*
*Id.* at 157 (emphasis added).

46. We reject Hudak's contention that "trial court overlooked the probate of Helen's estate" in 1990 as evidence of Anna's knowledge that "the defendant claimed the property as his own, free from any trust." First, we note that the estate inventory, in fact, was not filed with the Register of Wills until August 21, 1991. This was not in compliance with the statutory requirements of DEL. CODE ANN. tit. 12, § 1905, which mandates the filing of an inventory within three months after the executor assumes his duties. As this Court noted in *Adams v. Jankouskas*, 452 A.2d at 157–58, "when a person fails to timely perform a statutory duty, the purpose of which, at least in part, is to put another on notice that his or her vital interests are being affected, then such misfeasance cannot be converted into a shield by the former against the latter." Second, and more important, Helen was not the beneficial owner of the property and, thus, she could not bequeath a beneficial ownership interest through her estate. Accordingly, while the probate of Helen's estate arguably placed Anna Procek on notice that legal title to the property had passed to John Hudak, the record does not support Hudak's contention that Anna should have been on notice that he claimed fee simple ownership of the property "free from any trust."

### Resulting Trust Terms

Having held that the evidence was sufficient to support the trial court's imposition of a resulting trust, we nonetheless conclude that this matter must be remanded to the Court of Chancery for a determination, on an expedited basis, of the terms of the resulting trust and for a determination and award of any credit to the Hudaks for expenses attributable to maintenance and preservation of the trust res.[47]

### Conclusion

The judgment of the Court of Chancery imposing a resulting trust on the property in favor of Anna Procek is affirmed. This matter is remanded for further proceedings consistent with this opinion.

HOLLAND, Justice, dissenting, with whom Justice Berger joins.

In 1996, Anna Procek ("Anna") filed a complaint for equitable relief in the Court of Chancery. In that action, she sought to impose a resulting trust upon a real estate conveyance that occurred in 1978. During the eighteen-year interval between the 1978 real estate transaction and the 1996 lawsuit, three key parties died: the attorney who conducted the 1978 real estate settlement (1989); the sole grantee, Anna's daughter, Helen Hudak ("Helen") (1990); and the only other party who had an interest in the original transaction, Anna's husband, John Procek (1993). Prior to Helen's death in 1990, Anna and John Procek declined Helen's offers to deed the property to them. Helen's will left the property to her husband, John Hudak. Instead of challenging that inheritance, Anna and

John Procek immediately acknowledged John Hudak's ownership of the property. Within two months of Helen's death, the Proceks asked John Hudak to sign an agreement giving them lifetime rights to live at the property—which he did. Under these circumstances, Anna's 1996 action for equitable relief is barred by the doctrine of laches.

### Facts

In 1978, a residential property was purchased one block from Helen's home. Helen's parents, Anna and John Procek, provided Helen with all of the purchase money and requested her to title the property in her name. The now deceased lawyer who conducted the settlement was engaged by Helen. The residential property was titled in Helen's name alone in fee simple. In 1978, Helen had been married to John Hudak for twenty-three years.

The Proceks were not present at the 1978 real estate transaction. There is no dispute, however, that they knew the property had been titled in Helen's name only, even though it had been purchased exclusively with their funds. The record is also undisputed that the Proceks moved into the property immediately and made it their personal residence. They lived there together until John Procek died in 1993. Anna moved out of the property partially in 1994 and moved out completely in 1996.

On several occasions, before she died from cancer, Helen offered to transfer legal title in the property to the Proceks, but they declined. Thus, the undisputed record reflects that while all three of the

---

47. Our ruling leaves it to the Court of Chancery to determine, in the first instance, what issues are ripe for consideration in resolving the terms of the resulting trust. This case has gone on far too long. We have directed the Court of Chancery to proceed with this final phase "on an expedited basis." Trusting the traditional efficiency of the Court of Chancery to deal with expedited matters, we expect a prompt resolution of this remaining detail in the case. We hope there will not be the need for another appeal to this Court, but if there is, we will deal with that on an expedited basis as well.

parties to the 1978 real estate transaction were alive they discussed having Helen convey the property to the Proceks, but decided to leave title to the property in Helen's name alone. Helen died in April 1990.

Helen, who was undisputedly a loving and devoted daughter, did not devise the property to her parents. Upon Helen's death, the property that had been purchased in 1978 was left in Helen's will to her husband, John Hudak. Following Helen's death, the Proceks were immediately aware that John Hudak was the sole owner of the property where they lived.

Instead of initiating timely litigation to challenge John Hudak's inheritance of the property, the Proceks expressly acknowledged the validity of John Hudak's ownership. Shortly after Helen's death, John Procek asked John Hudak to sign an agreement giving the Proceks lifetime rights in the property where they resided. The agreement was prepared at John Procek's request by a neighbor, who was apparently a non-Delaware lawyer. Within two months of Helen's death, John Hudak and John Procek signed an agreement giving lifetime rights in the property to both Anna and John Procek.

John Hudak settled Helen's estate. By statute,[48] the Proceks had six months to file a claim and assert their interest in the property that Helen had devised to John Hudak. The Proceks did not file a claim against the property with Helen's estate. They were apparently content with title passing to John Hudak since he had agreed in writing for the Proceks to have lifetime rights in the property.

The 1990 agreement for lifetime rights could be construed in two different ways, but either of those constructions favors John Hudak's present claim of ownership.

First, the 1990 agreement could be viewed as an acknowledgement by the Proceks of Helen's ownership since 1978. Second, to the extent the Proceks disputed Helen's authority to leave the property to John Hudak in her will, the 1990 agreement for lifetime rights could be construed as an accord and satisfaction. The fact remains that, whichever construction of the 1990 agreement is accepted, the Proceks filed no challenge to John Hudak's ownership of the property against Helen's estate within the six-month statute of limitations.

Following the 1990 agreement, the Proceks continued to reside together at the property until John Procek's death in 1993. At this point in time, John Procek's death prejudiced John Hudak in triplicate. First, John Procek was unavailable to testify with regard to the original 1978 real estate transaction that placed title to the property in Helen's name. Second, John Procek was unavailable to testify regarding the Procek's decision not to accept Helen's offer to title the property in their name while both Helen and John Procek were alive. Third, John Procek was unavailable to testify regarding his request for and execution of the 1990 agreement for lifetime rights in the property rather than challenging Helen's right to transfer ownership to John Hudak in her will.

Following her husband's death in 1993, Anna continued to live in the property consistent with the lifetime rights that were afforded to her pursuant to the 1990 agreement. In 1996, Anna moved out of the property completely and went to reside with her daughter, Irene Setz. The Proceks' youngest daughter, Annie, asked John Hudak to sell the house and to divide the proceeds equally among the Proceks' two living daughters and himself. John Hudak refused that request. Anna then

48. Del.Code Ann. tit. 12, § 2102(b) (2001).

instituted this action in 1996, requesting the Court of Chancery to set aside the 1978 real estate transaction and to impose a resulting trust on the property in her favor.

## Doctrine of Laches

A resulting trust is an equitable remedy. The doctrine of laches acts as a bar to an action in equity if two conditions are satisfied: first, the plaintiff waited an unreasonable length of time before bringing the lawsuit; and second, the delay unfairly prejudiced the defendant.[49] This inquiry depends on the totality of the circumstances surrounding the filing of the complaint.[50] The cases reflect, however, that in balancing the equities of barring a complaint pursuant to the doctrine of laches, the prejudice caused by the death of principal participants or key witnesses outweighs the length of delay as the dispositive consideration. More than a century ago, the United States Supreme Court held:

> No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the *death of the principal participants* in the transactions complained of, or of the *witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible.*[51]

An application of that venerable rule to the facts of this case compels the dismissal of Anna's complaint for equitable relief.

## Laches from Delay with Deaths

Less than two years ago, in *Fike v. Ruger*,[52] this Court ruled that "[i]n applying laches, a plaintiff is chargeable with such knowledge of a claim as he or she might have obtained upon inquiry, provided the facts already known to that plaintiff were such as to put the duty of inquiry upon a person of ordinary intelligence."[53] This Court further stated that in the context of laches "prejudice can be found where a party dies while the other party sits on its claim."[54] This Court affirmed the Court of Chancery's judgment that barred the plaintiffs' claim by laches since the plaintiffs' were on inquiry notice of their claim for *only three* years prior to filing suit and the defendants were prejudiced in the interim by the death of the joint venture's accountant and one of the joint venturers.[55]

---

49. *See Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000) (citing *Fed. United Corp. v. Havender*, 11 A.2d 331, 343 (Del.1940)).

50. *See Fed. United Corp. v. Havender*, 11 A.2d at 343 ("Change of position on the part of those affected by non-action, and the intervention of rights are factors of supreme importance.").

51. *Hammond v. Hopkins*, 143 U.S. 224, 250, 12 S.Ct. 418, 36 L.Ed. 134 (1892) (emphasis added).

52. *Fike v. Ruger*, 752 A.2d 112 (Del.2000).

53. *Id.* at 114.

54. *Id.* (citing *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del.Ch.1978)); *see Cooch v. Grier*, 59 A.2d 282, 287 (Del.Ch. 1948).

55. *Id.*

Anna was on inquiry notice of her claim since 1978. When Anna filed her complaint in 1996, the deaths of three out of the four parties to the disputed 1978 real estate transaction prejudiced John Hudak. The three parties to the 1978 real estate transaction were Helen and her parents, the Proceks. The attorney who conducted the 1978 real estate settlement died in 1989. Helen died in 1990. John Procek died in 1993. In the interim, John Hudak inherited the property from Helen in 1990 and settled Helen's estate.

The facts in *Fike* are analogous to those that are extant in this case. The death of the settlement attorney parallels the death of the accountant in *Fike*. The deaths of *both* Helen and John Procek are more than analogous to the death of *one* joint venturer in *Fike*. Moreover, Anna was less timely in filing suit than the plaintiff in *Fike*. Anna did not file her complaint until eighteen years after the 1978 real estate transaction, six years after Helen's death and three years after her husband's death.

Twenty years ago, in *Adams v. Jankouskas*,[56] this Court held that Register of Wills inventories are not "mere ministerial chore[s] to be taken lightly," but rather "provide for the expeditious settlement of estates for the benefit of all concerned."[57] This Court stated that an executor who files an inventory places a party on public notice as to claims of ownership of the decedent's property, which could justify the imposition of laches.[58]

Following Helen's death in 1990, the listing of the property as an asset in the inventory of Helen's estate placed the Proceks on public notice that the property

conveyed by the 1978 real estate transaction was being included in Helen's estate. More specifically, John Hudak's filing of that inventory constituted public notice to the Proceks that their alleged interest was being adversely affected. It provided the Proceks with knowledge of their alleged claim against Helen's estate and or John Hudak. In addition to the constructive public notice of John Hudak's inheritance from the inventory filed in Helen's estate, the record reflects that the Proceks had actual immediate notice that Helen had left the 1978 property to John Hudak in her will.

The Proceks were on inquiry notice of their claim since 1978 when they knew the property was titled in Helen's name. Their obligation to act became paramount, however, when the property was transferred by Helen's will to a third party, John Hudak. Within two months of Helen's death, however, the validity of John Hudak's title to the property was expressly acknowledged by John Procek in an agreement that gave Anna and John Procek lifetime rights in the house.

In *Hudson v. Layton*,[59] this Court stated that "[i]t is the established doctrine of courts of equity to refuse their aid, or to interfere, after a considerable length of time."[60] This Court recognized that the doctrine of laches is founded on "the difficulty of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost, or depends on the precarious memory of witnesses."[61] The Court affirmed the Court of Chancery's ruling that barred a plain-

56. *Adams v. Jankouskas*, 452 A.2d 148 (Del. 1982).

57. *Id.* at 157.

58. *Id.*

59. *Hudson v. Layton*, 1848 WL 815 at *12, 1848 Del. LEXIS 32 (Del.Supr.).

60. *Id.* at *13, 1848 Del. LEXIS at *35.

61. *Id.*

tiff's claim for specific performance of an agreement for the conveyance of land since more than a twenty-year lapse occurred creating conjecture and uncertainty as to the initial transaction.[62]

Anna's eighteen-year delay in bringing her claim prevented the Court of Chancery from "doing entire justice" when the original disputed transaction became obscure due to the death of two parties and the death of another key witness. Anna's failure to assert her claim for eighteen years prevented those three parties from providing testimony as to the intent of the 1978 real estate transaction. This led to the uncertainty and conjecture reflected in the record of this case. By delaying her claim until after the death of the three parties, Anna prejudiced John Hudak's ability to defend the validity of his inheritance.

In *Hammond v. Hopkins*,[63] the United States Supreme Court stated that the doctrine of laches is "peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible."[64] Similarly, the death of two principal participants, Helen and John Procek, and the death of a witness (the settlement attorney) to the transaction prevented the Court of Chancery from doing entire jus-

tice through the lack of crucial testimony as to the parties' intentions in 1978.

In *Mackall v. Casilear*,[65] the United States Supreme Court stated that a court of equity will not aid a plaintiff "where the difficulty of doing entire justice" through the death of principal witnesses or from the original transaction becoming obscured by time is attributable to gross negligence or deliberate delay.[66] The Supreme Court affirmed the lower court's ruling that barred the plaintiff's claim for filing suit against his father for fraudulent conveyances after his father's death and only a *five-year* delay.[67] In reaching that conclusion, the United States Supreme Court found it was significant that the son had not only refused to challenge the transaction while his father was alive, but that the son also accepted benefits from the transaction which he subsequently decided to attach. Similarly, in this case, Anna and John Procek not only declined Helen's offers to convey the property while all three of them were alive, but Anna accepted a life interest in the property pursuant to the 1990 agreement, which acknowledged the validity of John Hudak's inheritance from Helen.

The Court of Chancery has also specifically addressed the doctrine of laches in several cases where a defendant incurs prejudice due to the death of a principal participant to the transaction during the

62. *Id.* at *12–13, 1848 Del. LEXIS at *34–36.

63. *Hammond v. Hopkins*, 143 U.S. 224, 12 S.Ct. 418, 36 L.Ed. 134 (1892).

64. *Id.* at 250, 12 S.Ct. 418; *see also Sanchez v. Deering*, 270 U.S. 227, 229–30, 46 S.Ct. 214, 70 L.Ed. 556 (1926) (barring a plaintiff's claim for interest in real property on the basis of laches where the plaintiff delayed more than seventy years in asserting the claim and witnesses had died); *Penn Mut. Life Ins. Co. v.*

*City of Austin*, 168 U.S. 685, 696–99, 18 S.Ct. 223, 42 L.Ed. 626 (1898) (citing *Hammond v. Hopkins* in setting forth the rule of laches as expounded by the Supreme Court through prior caselaw).

65. *Mackall v. Casilear*, 137 U.S. 556, 11 S.Ct. 178, 34 L.Ed. 776 (1890).

66. *Id.* at 566, 11 S.Ct. 178.

67. *Id.* at 566–67, 11 S.Ct. 178.

plaintiff's delay. In *Cooch v. Grier*,[68] the Court of Chancery ruled that in a suit to set aside a fraudulent conveyance the right to assert the defense of laches is available.[69] The Court of Chancery held that laches barred the plaintiff's claim for a lien on real property since a fourteen-year delay prejudiced the defendant through the death of the grantee.[70] The Court of Chancery noted that "[i]t has been said that laches will apply where there is an unexplained delay in prosecuting the claim until death has closed the lips of the interested parties."[71]

Similarly, death silenced the testimony of not only the sole grantee, Helen, but death also silenced another principal participant—her father, John Procek—as well as the attorney who conducted the 1978 real estate transaction. In this case, the record reflects the Court of Chancery expressed concern that the three parties were dead:

> I acknowledge that the two other principal parties who knew the circumstances surrounding the initial transaction in 1978 will never be heard because they have since died. I would have liked to have heard from the settlement attorney to learn what Helen did or did not tell

him about the $70,000 Procek transaction, but he too died before trial.[72]

The unavailability of the testimony from those three parties is attributable exclusively to Anna's eighteen-year delay in filing her complaint.

In *Sharpley v. Sharpley*,[73] a plaintiff sought specific performance of an alleged agreement between cotenants to partition property more than fourteen years after the alleged agreement was made.[74] The Court of Chancery held that the plaintiff's claim was barred by laches where death had silenced the testimony of a principal participant to the disputed transaction.[75] The Court of Chancery further stated that it would be inequitable to order specific performance where parties who were alleged to have arranged to exchange deeds during their lifetimes failed to do so:

> [I]t would seem that laches is a bar to the relief asked. The complainant allowed at least fourteen years to go by after the alleged partition was made before appealing to this court for relief. In the meantime death had silenced the lips of his brother, the one person who more than all others was competent to give his version of the matter. The widow and children are driven to grope around as

**68.** *Cooch v. Grier*, 59 A.2d 282 (Del.Ch.1948).

**69.** *Id.* at 287–88.

**70.** *Id.* The trial court further concluded that laches barred the plaintiff from attacking personal property conveyances since death removed the alleged fraudulent grantee that could have defended the real estate transfer if it had been attacked with reasonable promptness. *Id.* at 288–89. *But cf. Keith v. Adams*, 1985 Del. Ch. LEXIS 500, at *60–68 (Del. Ch.) (holding that the death of a trustee, loss of potential evidence and the incompetence of a witness did not constitute prejudice to a defendant asserting laches where a written record of the events at issue existed); *Skouras v. Admiralty Enters., Inc.*, 386 A.2d 674, 682 (Del.Ch.1978) (holding that the death of a

chief organizer and manager of a corporation did not prejudice the corporation in producing information under a plaintiff's claim to inspect corporate books and records).

**71.** *Cooch v. Grier*, 59 A.2d at 287 (citing *Thrasher v. Ocala Mfg. Ice & Packing Co.*, 153 Fla. 488, 15 So.2d 32, 32 (1943)).

**72.** *Procek v. Hudak*, 2000 WL 546079 at *5, 2000 Del. Ch. LEXIS 62, at *18–19 (Del.Ch.).

**73.** *Sharpley v. Sharpley*, 132 A. 139 (Del.Ch. 1926).

**74.** *Id.* at 141–42.

**75.** *Id.* at 142.

best they may in search of the truth. The complainant says that he and his brother on several occasions arranged to exchange deeds, but neglected to do so. If, when he had the opportunity throughout ten years of his brother's lifetime to effect the division in an unmistakable way, he failed to do so, the fault is his own. It would be inequitable for this court under all the circumstances to supply what his own want of diligence has occasioned.[76]

Similarly, Anna should not be permitted to have the Court of Chancery impose a resulting trust eighteen years later, when Helen offered to convey the property to the Proceks during her lifetime and the Proceks declined to have Helen make that conveyance. As in *Sharpley*, the fact that John Procek and Helen are dead and cannot testify is prejudicial to John Hudak's (the widower's) ability to defend his inheritance.

### Laches Bars Anna's Claim

In 1996, Anna sought to challenge the 1978 real estate transaction. Anna seeks to defeat John Hudak's right to inherit the property from Helen even though when Helen and John Procek were alive, all parties acted as if the property was Helen's to dispose of in her will and John Procek subsequently validated John Hudak's inheritance with an agreement for lifetime rights. The doctrine of laches operates as a bar to Anna's complaint because of her delay in asserting her claim until after the death of the three most knowledgeable parties.

Although Anna seeks to set aside the 1978 real estate transaction, the two events that occurred before and in 1990 are almost equally significant because they both are inconsistent with Anna's present challenge. With regard to the 1978 settlement, John Hudak is prejudiced by Anna's eighteen-year delay due to the deaths of the closing attorney (1989), Helen (1990) and John Procek (1993). John Hudak is further prejudiced from presenting testimony about the decision to leave the property in Helen's name during Helen's lifetime because Helen and John Procek are now both deceased. Finally, John Hudak is prejudiced by John Procek's death from explaining why John Procek acknowledged the validity of the transfer by will from Helen to John Hudak in exchange for the lifetime rights to reside in the property that were provided for in the 1990 agreement.

More than one hundred years ago, the United States Supreme Court described the equitable rule of law that must be applied in this case:

[W]here the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour-glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused.[77]

Anna's 1996 complaint is barred by the doctrine of laches. It is impossible for the Court of Chancery to provide entire justice with regard to the 1978 real estate transaction because two of the three principal participants and one other witness have died.

### Resulting Trust Terms

The final order of the Court of Chancery simply provides:

---

76. *Id.*

77. *Hammond v. Hopkins*, 143 U.S. 224, 274, 12 S.Ct. 418, 36 L.Ed. 134 (1892).

The real property at 2004 Marlboro Drive, Wilmington, Delaware 19808, described on the attached Exhibit "A", is impressed with a resulting trust, and John Hudak, Jr. and John M. Hudak hold title as trustees for the benefit of Anna Procek.

The lis pendens is dismissed and removed from the public record. This order may be recorded in the Office of the Recorder of Deeds in and for New Castle County, State of Delaware.

The majority opinion affirms the imposition of a "resulting trust" notwithstanding the absence of any terms or conditions in the Court of Chancery's judgment. Upon remand, the following questions will need to be answered in deciding the terms of the resulting trust:

Can Anna force the trustees to sell the property? If the trustees refuse, will the Court of Chancery compel the sale? What are the terms by which the money will be held and distributed before and after Anna's death?

If the property is not sold, what happens to the property at Anna's death?

The Court of Chancery acknowledged that Helen's claim to the title failed because she died before she could take care of her parents for the rest of their lives. Mr. Procek lived for fifteen years after 1978. Helen took care of him for twelve of those years, i.e., for 80% of his life after 1978. Is Helen's estate entitled to 80% of a one-half interest in the property on a *quantum meruit* basis? Similarly, does Helen's estate get credit for Anna's care for twelve years?

The matter is now remanded to the Court of Chancery to determine the terms of the trust. The order that sets those terms and conditions may result in another final judgment that is subject to review by this Court. By then, Anna will be more than one hundred years of age and the transaction at issue more than twenty-five years old.

### Conclusion

Since I have concluded that Anna's complaint for equitable relief is barred by the doctrine of laches, I respectfully dissent.